IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL JUDE, | ) | CASE NO. 1:17CV1876 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Michael Jude ("Jude") seeks judicial review of the final decision of Defendant

Commissioner of Social Security ("Commissioner") denying his applications for child's

insurance benefits ("CIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I. Procedural History

On October 2, 2014, Jude filed applications for CIB and SSI, alleging a disability onset

date of February 10, 2014.  Tr. 77, 198-203.[1]  He alleged disability based on the following:

attention deficit hyperactivity disorder and Asperger syndrome.  Tr. 77.  After denials by the

state agency initially (Tr. 99, 100) and on reconsideration (Tr. 129, 130), Jude requested an

administrative hearing.  Tr. 162.  A hearing was held before Administrative Law Judge ("ALJ")

Joseph Hajjar on June 10, 2016.  Tr. 36-76.  In his August 30, 2016, decision (Tr. 20-30), the

ALJ determined that there are jobs that exist in significant numbers in the national economy that

---

[1]  Jude was under 18 on the alleged onset date but was 18 at the time he filed his applications.

Jude can perform, i.e. he is not disabled.  Tr. 29.  Jude requested review of the ALJ's decision by the Appeals Council (Tr. 197) and, on August 11, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Jude was born in 1996 and was 18 years old when he filed his applications.  Tr. 289. After graduating from high school, he participated in a vocational training program through which he got a job volunteering at the Cleveland Clinic.  After he graduated from the program, he got a part-time job as a cleaner at the county library.  Tr. 45-46, 49.

### B. Relevant Medical Evidence

As a minor, Jude was diagnosed with Asperger's syndrome, Tourette syndrome, and attention deficit/hyperactive disorder ("ADHD").  See, e.g., Tr. 535.  He was treated with the medication Concerta and Adderall.  Tr. 535-536.

Dr. Needleman: On December 5, 2013, before his alleged onset date, Jude saw his pediatrician, Robert Needlman, M.D., for a physical exam so that he could apply with the Cuyahoga County Board of Developmental Disabilities ("CCBDD").  Tr. 678.  At the time, Jude was a junior in high school.  Tr. 678.  He worked hard, had friends, needed "much extra support" at home to remember chores and personal hygiene, could make change, and could save money for things he wanted.  Tr. 678.  His father told Dr. Needlman that he was concerned Jude would not be ready to go into the workforce.  Tr. 678.  Dr. Needlman wrote that Jude was "now functioning well with minimal supports, but persisting concerns about ability to function in the real world."  Tr. 679.

On January 16, 2014, Dr. Needlman wrote a letter to Jude's father regarding Jude's SSI application.  Tr. 689.  Dr. Needlman wrote that Jude was doing "reasonably well academically" but was "socially very immature" and lacked common sense.  Tr. 689.  Dr. Needlman stated,

> In the world of work, he would be at risk for failing to meet job expectations (despite the intellectual ability to do so), and for being exploited. I would not expect him to be able to manage his own living arrangements, financial arrangements, and social life at this point, and perhaps not for several years to come (if at all). These characteristics common in teens with Asperger syndrome (and especially when complicated by ADHD) are significantly disabling, but may not show up in routine psychological testing.

Tr. 689.

Counselor Perrett: On January 23, 2014, counselor Stacy Perrett, a licensed professional clinical counselor, assessed Jude for the CCBDD as a part of his application to take part in Project Search to assist him find employment after high school.  Tr. 690.  As part of her assessment, Perrett relied on the available records and interviewed Jude and his father.  Tr. 690.  Perrett commented that Jude had significant adaptive skill impairments across various life domains, including learning, problem-solving abilities, and his ability to analyze, synthesize, and/or integrate information.  Tr. 690.  His capacity for economic self-sufficiency was significantly impaired, as he required "complete assistance with utilizing banking facilities, paying bills, establishing/maintaining a budget."  Tr. 690.  With respect to independent living, he required prompting/and or assistance with shopping, laundry, meal preparation/ healthy meal planning, and completing routine chores/household maintenance.  Tr. 690.  He required assistance obtaining employment within a supported setting, as well as job coaching, verbal prompting, modeling, and monitoring to assist with learning various job tasks.  In conclusion, Perrett stated, "When taking into consideration Mr. Jude's developmental disability, coupled with adaptive skill impairments, results of this current assessment suggest that Mr. Jude continues to demonstrate the ongoing need for supervision, prompting, and monitoring around

various activities of daily living in order to support his overall health and safety."  Tr. 690.

Psychology supervisor Nancy Klooz, Ph.D., signed the form on February 4.  Tr. 690.

School psychiatrist Krabec: On March 5, 2014, Jude, at that time a senior in high school, was assessed by the school psychiatrist, Kara Krabec, Ed.S., as part of his IEP.  Tr. 237-243.  He scored in the average to below average range in two tests: the Kaufman Brief Intelligence Test (average) and the Kauffman Test of Educational Achievement (average-below average).  Tr. 238-239.  His band and choir teacher reported that Jude had come a long way socially since being in his general education class.  Tr. 240.  Jude's father filled out a parent rating scale and assessed Jude as clinically significant (high level of social maladjustment) in the area of "atypicality" (odd or strange behavior), hyperactivity, and "functional communication" (using expressive and receptive language skills and seeking out information independently).  Tr. 239-241.  Jude's father's also placed Jude in the "at risk" (significant problem that may not be severe enough to require formal treatment or may identify the potential of a developing problem) level for social skills, activities of daily living, anxiety, and withdrawal.  Tr. 241.  Jude's teacher assessed him with "elevated" and "very elevated" scores in peer socialization and social/emotional reciprocity, respectively, indicating that, in the classroom, Jude had difficulty engaging in activities and maintaining and developing relationships with peers and significant difficulty providing appropriate emotional responses in social situations.  Tr. 242.  At the time, Jude was participating weekly in a community-based worksite and was described as a very good and conscientious worker who sometimes needed to be redirected and he was an eager, bright and quick learner who took criticism well.  Tr. 243.

Dr. Koricke: On September 3, 2014, Jude and his father saw Deborah Koricke, Ph.D., for a consultative examination.  Tr. 706-713.  At the time, Jude was a senior in high school, was

working at the Cleveland Clinic as an intern, and had previously worked at two other jobs through vocational training: at a diner, performing cleaning duties, and at the Salvation Army removing clothes from racks.  Tr. 707.  He reported that his ADHD medication, Concerta, helped calm him down.  Tr. 708.  Jude could not identify Asperger syndrome symptoms that he had; his father stated that Jude was diagnosed in his youth "but he could not be more specific about the nature of the problems either."  Tr. 708.  His father did report that Jude was socially awkward and isolative, that he needed a routine, becomes upset when is routine is broken, and he became "somewhat agitated when faced with novel situations."  Tr. 708.

Jude denied symptoms indicative of clinical depression, anxiety, mania, or other emotional disturbances.  Tr. 708.  He had adequate motivation, energy, and interests.  Tr. 708. He did not have delusions, hallucinations, paranoid thoughts, obsessive thought processes, or symptoms indicative of psychotic processes.  Tr. 708-709.

Dr. Koricke observed that throughout the examination Jude appeared friendly and happy and was polite and cooperative, but he looked to the floor, made minimal eye contact, demonstrated finger rolling, and became easily frustrated when he did not know something.  Tr. 709.  He responded appropriately to questions, albeit in a monotone voice without inflection.  Tr. 709.  He exhibited limited attention during the examination such that questions had to be repeated.  Tr. 709.  He was distracted but not hyperactive or impulsive.  Tr. 709.  He had adequate memory for his history, despite evidence of attention deficits, and he consistently made a good effort on all tasks and persisted to the end of the time limit.  Tr. 709.  He was motivated to do well and eager to please.  Tr. 709.  His speech was fairly simplistic and he exhibited some long latency in responding, but he was understandable in all contexts and he responded appropriately with no evidence of speech or language disorders.  Tr. 709.  He understood simple

5

questions and instructions but had trouble with complex or multi-step instructions, and these had

to be broken down into smaller segments of information for him to understand.  Tr. 709.  He was

conscious and alert with adequate memory.  Tr. 710.  He demonstrated adequate insight and

judgment and testing showed that he was in the low average range of intellectual functioning.

Tr. 710.  He could only perform simple math equations in his head and he lost his train of

thought.  Tr. 710.  He could repeat 5 digits forward and 3 backward but could not perform serial

7s or 3s.  Tr. 710.  He recalled 2 out of 3 words after a five minute delay.  Tr. 710.  His ability

for abstract thinking was slightly below the mean.  Tr. 710.  Dr. Koricke commented that Jude

"still appears dependent upon his father for guidance and is not viewed as possessing sufficient

judgment to seek medical care if needed without assistance from his family."  Tr. 710.  Jude

reported that he had difficulty handling his money and that his father did it for him.  Tr. 710.  He

responded adequately to hypothetical situations presented by Dr. Koricke.  Tr. 710.

Jude scored a full-scale IQ of 87.  Tr. 711.  Dr. Koricke concluded that Jude understood

simple questions and instructions but had trouble following multi-step or complex instructions,

would experience difficulty understanding how to perform tasks, and would require supervision

and structure to complete job duties accurately; he had trouble retaining learned information, had

difficulty focusing despite taking medication, had a slow work pace, and his persistence was

within normal limits; he could respond appropriately to supervision and to coworkers in a work

setting as long as instructions and job demands were presented in simple terms; and he would

likely have difficulty fully processing work pressure and may become confused and

overwhelmed under pressure.  Tr. 712.  In her conclusions, Dr. Koricke remarked that Jude

demonstrated symptoms indicative of Autistic Spectrum and, although he was overwhelmed by

difficult tasks and unsure of himself in the exam, he maintained normal affect and mood.  Tr.

712.  She advised that Jude did not have the mental ability to manage his funds due to his immaturity and limited mathematical skills and that a guardian (likely his father) should be appointed to assist him in managing his finances "if he is awarded such."  Tr. 713.

State Agency Reviewers: On October 6, 2014, state agency psychologist Ron Marshall, Ph.D., reviewed Jude's record.  Tr. 83-85.  Regarding Jude's RFC, Dr. Marshall opined that Jude could perform rote tasks, could follow and retain simple instructions, may work better with brief interactions with others and best with simple, repetitive tasks that minimize new changes.  Tr. 85.  On April 8, 2015, state agency psychologist Paul Tangeman, Ph.D, reviewed Jude's record and adopted Dr. Marshall's opinion.  Tr. 110-112.

Dr. Urcuyo: On January 21, 2016, Jude and his father saw Daniel Urcuyo, M.D., "for completion of forms provided by his lawyer and to establish care."  Tr. 792.  Dr. Urcuyo noted, "Although [Jude] is verbal and interactive, a majority of the history was obtained by his father."  Tr. 792.  Jude's father told Dr. Urcuyo that he was very concerned for his son because he and his family are getting older and one day will not be able to care for him, so he hired a lawyer to help apply for government assistance.  Tr. 792.  Jude's father indicated that Jude had several mental problems, such as easy distractibility and needing reminders to finish tasks.  Tr. 792.  Physically, Jude liked to go on walks and was able to walk for hours without assistance.  Tr. 792.  That day, Dr. Urcuyo completed a checkbox-format questionnaire regarding Jude's mental capacity to perform work.  Tr. 733-734.  He opined that Jude could constantly maintain appearance and regular attendance and be punctual within customary tolerance; and could frequently maintain attention and concentration for extended periods of two hour segments, deal with the public, interact with supervisors, understand, remember, and carry out simple job instructions, and behave in an emotionally stable manner.  Tr. 733-734.  He could occasionally follow work rules,

use judgment, respond appropriately to changes in routine settings, relate to co-workers, function independently without redirection, work in coordination or proximity to other without being distracted or distracting, understand and carry out detailed, but not complex instructions, socialize, relate predictably in social situations, and leave home on his own; and could rarely carry out complex job instructions, manage funds/schedules, deal with work stress, and complete a normal work day and work week without interruption from psychologically based symptoms and perform at a consistent pace without unreasonable number and length of rest periods.  Tr. 733-734.

On February 4, 2016, Jude followed up with Dr. Urcuyo for a full physical examination. Tr. 785.  Upon exam, Jude made good eye contact, spoke fluently and coherently, had a euthymic mood, and had an appropriate affect.  Dr. Urcuyo concluded that it was a normal physical exam.  Tr. 786.

Dr. Owen: On July 31, 2015, Jude saw Scott Owen, D.O., complaining of ear discomfort and muffled hearing.  Tr. 801.  Dr. Owen determined that seasonal allergies were the cause and suggested Jude take allergy medications.  Tr. 802.

On April 19, 2016, Jude returned to Dr. Owen "to have SSI application assessments completed."  Tr. 783.  Dr. Owen remarked that he completed the requested questionnaires with information "based on father and patients accord."  Tr. 783.  In the questionnaire, Dr. Owen checked boxes indicating that Jude could frequently follow work rules, maintain attention and concentration for extended periods, deal with the public, intact with supervisors, understand, remember, and carry out simple job instructions, maintain appearance, and behave in an emotionally stable manner.  Tr. 731-732.  He could occasionally or rarely complete the remaining areas of mental functioning the form addressed.  Tr. 731-732.

### C.  Testimonial Evidence

#### 1. Jude's testimony

Jude was represented by counsel and testified at the administrative hearing.  Tr. 41-59.

Jude testified that, at the time of the hearing, he was 20 years old and lived in a home with his

parents.  Tr. 41.  He has no siblings and has a dog that he and his mother take care of.  Tr. 41.

He works the night shift cleaning part time at the county library.  Tr. 42.  There he does the trash,

vacuums, does "hard surfacing" and dusts.  Tr. 42.  He used to clean the toilets but now there is

someone permanent who cleans the bathrooms.  Tr. 42.  When he first started working there he

was supervised for a few weeks.  Tr. 47-48.

Jude works from 9:00 to 12:00 on Monday through Thursday nights and, on Fridays and

Saturdays, from 5:30 p.m. to 8:30 p.m.  Tr. 42.  He takes the bus to work and it takes about an

hour to get there.  Tr. 42-43.  He doesn't have to change buses.  Tr. 43.  The bus doesn't run on

the weekdays when he gets off work late, so his father or grandfather comes and picks him up at

the library.  Tr. 43.  Otherwise, he takes the bus home after work and his dad will pick him up at

the transit station.  Tr. 43.  He gets a paycheck every two weeks.  Tr. 44.  He had been working

there about 8 months.  Tr. 44.  When asked if he could perform his library work or something

similar full time, Jude answered that he could.  Tr. 49, 50.  He had no difficulty performing this

type of work.  Tr. 49.  There was a time when they told him his vacuuming wasn't very good, but

he improved it.  Tr. 50.  He understands when they give him directions about what to do.  Tr. 50.

Prior to his job at the library, Jude performed volunteer work at the Cleveland Clinic

doing "pretty much surgical processing, EVS and surgical support."  Tr. 45.  Basically, he

cleaned bowls and trays used in operations, mopped, operated the industrial washers and dryers,

and stacked and organized things.  Tr. 45.  He would also clean the operating rooms.  Tr. 45.  He performed these duties for about 6 months.  Tr. 45-46.

Jude is a high school graduate but was not yet applying to colleges.  Tr. 49.  He plans to; he wants to be a physical therapist.  Tr. 49.  When he is not working, he likes to play video games and go out for walks.  Tr. 49.  He mows the grass and takes out the trash.  Tr. 49.  He is also looking for other work and has sent out a few applications but has not gotten any responses.  Tr. 44, 49.

Jude manages his bank account and can write checks if he has to.  Tr. 51-52.  He explained that his checks are electronic.  Tr. 52.  He does have at least two bills that require him to write checks and send them in the mail.  Tr. 52.  He just paid one the other day, to the Cleveland Clinic.  Tr. 52.  His dad helps him manage his bank account.  Tr. 53.  His dad also helps him with other things, but he couldn't remember what else other than his bank account.  Tr. 53.  When asked if he could read a bus schedule and figure out how to transfer to a bus to get home, Jude stated that he could.  He explained, "I mean I never actually did a transfer before, but I know how to read a schedule."  Tr. 53.  He does not have a driver's license but he does have his temps.  Tr. 53-54.  He passed the exam the first time, albeit barely; "I got the exact score I'm supposed to get."  Tr. 54.  He has had a little problem driving since he got his temps, mostly with parallel parking.  Tr. 54.  He has had a few accidents before he got his temps; once when he was backing the car out of the garage and he misheard the direction his father told him to turn and he scratched up the side of the car, and another time when his father asked him to get the keys out of the car that his father had left in the car and, when he did, the car started rolling backwards and Jude panicked.  Tr. 54.  He tried to stop it but it rolled and hit another car and banged up the door of his dad's car.  Tr. 54.  There was no damage to the other car.  Tr. 54.

Jude stated that he did not get any help when he filled out job applications.  Tr. 55.  The job applications are online.  Tr. 58.  When he applied for jobs when he was in a program and getting job coaching, his job coach helped him a little to fill out the forms.  Tr. 55.  In school, Jude was in special education classes and had some accommodations.  Tr. 55.  He did not have a person read instructions to him, although he has had an auto read test using earbuds.  Tr. 56.  If he was given a newspaper article and asked to read it, he thinks he could understand it.  Tr. 56.  He stated that he had never actually done it before; "I'm not much of, I mean if its politics I probably wouldn't understand the, I'm not much of a man of politics."  Tr. 56.

Jude testified that he kind of needs reminders for his personal hygiene, mostly for brushing his teeth.  Tr. 57.  He has been doing better.  Tr. 57.  He has a cell phone, a pre-paid flip phone.  Tr. 58-59.

### 2. Jude's father's testimony

Jude's father was present and testified at the administrative hearing.  Tr. 61-71.  Jude's attorney asked him if Jude had read the letters from the Administration setting the hearing date and he answered that he had told Jude about the hearing, showed Jude the letter, asked Jude if he understood what the letter said, and that Jude answered that the letter said that he had to go to court on this day.  Tr. 62.  He read all of Jude's legal mail because a couple of times he found things such as bills off to the side and he didn't know about them.  Tr. 63.

Jude's father confirmed that Jude has a bank account and stated that Jude "somewhat" manages his own account; "I assist him."  Tr. 63.  He has been teaching him to write bills and tells him what to do with his bills.  Tr. 63.  He has been showing him a computer program on the computer for keeping receipts and how to enter data.  Tr. 63.  He makes Jude a check register from the computer program for him to keep track and sometimes he has to ask Jude if he put his

data in and Jude answers that he had forgotten.  Tr. 63.  Then, Jude's father has Jude bring all his paperwork to him and they sit down and enter it into the computer and he tells Jude how to double check his bank statements to make sure they are correct.  Tr. 64.  They go to the bank together and Jude takes out money to buy himself things and he deposits money as well.  Tr. 64.  Jude likes to collect change.  Tr. 64.  Sometimes when Jude goes for walks he uses the ATM machine.  Tr. 64.  Jude's father has been helping Jude with banking for a few years.  Tr. 64.  He is getting better but he still hasn't mastered it.  Tr. 64.

Jude's father taught him how to use the bus.  Tr. 65.  A couple of times Jude has had to call home because he missed the bus because he got the times wrong.  Tr. 65.  When he volunteered at the Cleveland Clinic he had to transfer on the rapid.  Tr. 65-66.  Jude's father practiced it with him about 3-4 times and Jude seemed to be able to handle it.  Tr. 66.  The only thing that was worrying was the fact that Jude has a tendency to fall asleep.  Tr. 66.  He stated that Jude has never filled out a job application on his own.  Tr. 66.  Someone Jude's father had spoken to said that being a physical therapist is something that Jude could eventually do, although it would take time because Jude would need an associate's degree and proper training.  Tr. 67.  Jude has not applied for college yet; his father stated that Jude had a watered-down education through the public school system and had been in classes with severely handicapped kids, so he is socially inept and the education was not as good as it was for the mainstream students.  Tr. 67.  He has a few friends he talks to.  Tr. 68.

Jude's father testified that Jude performs chores around the house such as caring for pets, taking out trash, and other things.  Tr. 69.  A lot of times, however, he was finding out that Jude was not doing it and he has had to get after him a lot to get things done, like mowing the lawn.  Tr. 69.  He has to remind him of his oral hygiene; recently he explained to Jude what would

happen if he gets periodontitis, like Jude's father had, and that he tells Jude that Jude will have to start paying for half of his dental visits and that has seemed to incentivize Jude.  Tr. 70.

When asked whether Jude could maintain full-time employment, Jude's father answered, "Eventually."  Tr. 70.  He explained that work Jude does now is very repetitive and that, to get a full time position, Jude would have more growing up to do.  Tr. 70.  When asked whether Jude could perform a simple, repetitive job like his current job on a full-time basis, Jude's father answered, "Possibly."  Tr. 71.

### 3.  Vocational Expert's testimony

Vocational Expert Barbara Burk ("VE") testified at the hearing.  Tr. 71-75.  The ALJ asked the VE to determine whether a hypothetical individual of Jude's age and education, with no past work experience, could perform work if that person had the following characteristics: can perform simple, routine and repetitive tasks, but not at a production rate pace (therefore no assembly line work); can have frequent interaction with supervisors and occasional interaction with coworkers and the public; can make simple, work-related decisions; and can tolerate occasional routine workplace changes that can be explained.  Tr. 72.  The VE answered that such an individual could perform work as an automatic car wash attendant (50,000 national jobs); commercial cleaner (over 1,000,000 national jobs at all exertional levels); and housekeeping cleaner (140,000 national jobs).  Tr. 73-74.  The ALJ asked the VE how Jude's part-time job at the library would be characterized and the VE stated that it is a commercial cleaner job performed at the medium exertional level.  Tr. 73.

Next, Jude's attorney asked the VE whether a hypothetical individual of Jude's age, education and work experience could perform work if that person had the following characteristics: would not be responsible for any sort of reading or writing or performing math;

instructions would have to be demonstrated, could not be exposed to hazards or dangerous machinery; and would have to be redirected occasionally.  Tr. 74.  The VE stated that such a person could not perform the jobs previously identified due to the limitation that the individual would need to be redirected occasionally.  Tr. 74.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to

14

determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his August 30, 2016, decision, the ALJ made the following findings:

1.      Born in 1996, the claimant had not attained age 22 as of February 10, 2014, the alleged onset date.  Tr. 22.

2.      The claimant has not engaged in substantial gainful activity since February 10, 2014, the alleged onset date.  Tr. 22.

3.      The claimant has the following severe impairments: hyperactivity disorder, Asperger's syndrome, and learning disorder.  Tr. 22.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 23.

5.      The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: able to perform simple, routine, and repetitive tasks, but not at a production rate pace; frequent interactions with supervisors; occasional interactions with coworkers and the public; and able to

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

tolerate occasional, routine workplace changes that can be explained and is limited to making simple work-related decisions.  Tr. 25.

6.     The claimant has no past relevant work.  Tr. 28.

7.     The claimant was born in 1996 and was 17 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 29.

8.     The claimant has at least a high school education and is able to communicate in English.  Tr. 29.

9.     Transferability of job skills is not an issue because the claimant does not have past relevant work.  Tr. 29.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 29.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 10, 2014, through the date of this decision. Tr. 30.

## V. Plaintiff's Arguments

Jude objects to the ALJ's decision on two grounds: the ALJ violated the treating physician rule and did not consider all of the medical evidence.  Doc. 12, p. 1.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not violate the treating physician rule

Jude argues that the ALJ erred when he assigned less than controlling weight to the opinions of Jude's treating physicians, Drs. Urcuyo and Needlman.  Doc. 12, p. 11.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

A treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant.  *See* 20 C.F.R. § 404.1502.[3]  The plaintiff has the burden of showing that a doctor is a treating physician.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 506-508 (6th Cir. 2006) (plaintiff failed to show doctor was a treating physician and,

---

[3]  20 C.F.R. § 404.1502 was modified effective March 26, 2017.  The version relevant to the ALJ's decision was in effect from June 13, 2011, to March 26, 2017.

therefore, his opinion was not entitled to presumptive weight per the treating physician rule); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (claimant has the burden of proof in steps one through four).  Before determining whether the ALJ complied with the treating physician rule, the court first determines whether the source is a treating source.  *Cole v. Astrue*, 661 F.3d 931, 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)).  A physician qualifies as a treating source if the claimant sees him "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition."  *Smith*, 482 F.3d at 876.

### 1. Dr. Urcuyo is not a treating physician

Dr. Urcuyo completed a medical questionnaire the day Jude first visited him for the purpose of filling out a disability form.  Tr. 792, 734.  Thus, there was no treatment relationship and the ALJ was not required to follow the treating physician rule with respect to Dr. Urcuyo's opinion.  *See Kornecky*, 167 Fed. App'x 496, 506507 (a single exam by a physician does not render that physician a treating physician, collecting cases); *Staymate v. Comm'r of Soc. Sec.*, 681 Fed. App'x 462, 467 (6th Cir. 2017) ("The regulations make clear that a relationship based solely on [a claimant's] need to obtain a report in support of [a] claim for disability does not constitute a treating source," quoting 20 C.F.R. § 416.902) (internal quotation marks omitted).

### 2. Dr. Needlman

Jude argues that the ALJ should have afforded Dr. Needlman's opinion controlling weight.  Doc. 12, p. 13.  The ALJ explained the weight he gave to Dr. Needlman's opinion:

> Little weight is given to Robert Needlman, M.D., who found that, while the claimant was doing well academically, he was socially very immature and lacked common sense.  In the real work [sic], he noted this would put him at risk of failing to meet expectation[s].  He also noted symptoms resulting from his diagnoses are "significantly disabling" (Ex. 6F/1).  This is not consistent with the record or the claimant's and his father's testimony.  Specifically, he indicated he goes for walks, mows the lawn, and looks for jobs in

housekeeping.  Further, he testified he thought he could read and follow a bus schedule. He noted he has his own bank account and writes his own checks.  Moreover, he reported he completes job applications himself.  In addition, the claimant's father testified that he could eventually maintain full time employment.  Although there have been times where the claimant misread the bus schedule, his father testified these were isolated incidents. His father also testified that the claimant graduated from a vocational program, and has been functioning relatively independently.

Tr. 28.  In other words, the ALJ explained that Dr. Needlman's opinion was inconsistent with other substantial evidence in the case record and, therefore, was not entitled to controlling weight.  *See Wilson*, 378 F.3d at 544 (the ALJ must give the treating opinion controlling weight if he finds that it is not inconsistent with the other substantial evidence in the case record). Moreover, elsewhere in his decision, the ALJ remarked that Dr. Needlman had reported that Jude could make change, save money for what he wanted, and was functioning well with minimal supports.  Tr. 26, 678-679.  *See id*. (the ALJ also considers the supportability of the opinion).

Jude asserts that Dr. Needlman's opinion was consistent with the evidence in the case record.  Doc. 12, pp. 13-14.  He asserts that four different medical opinions, including consultative examiner Dr. Koricke, "found Mr. Jude to have a limitation that would render him disabled."  Doc. 12, p. 13.  He does not identify what portion of the other four opinions concluded that Jude had a limitation that rendered him "disabled."  To the extent Jude attempts to do so when he points out that Dr. Koricke opined that Jude could not manage his funds and would have difficulty understanding how to perform tasks and process work pressure (Doc. 12, p. 16), this argument fails.

First, the ALJ explained that Jude could understand how to perform tasks because he had been performing tasks.  He explained that, based on a function report that Jude filled out, Jude indicated that he took care of pets, attended his personal care needs, prepared meals, mowed grass, assisted with housecleaning, did laundry, went on walks, used public transportation,

shopped, counted change, handled his banking, read, watched television, spent time with others, and filled out job applications.  Tr. 25.  Jude testified that he had no difficulty performing his part-time cleaning job at the library without supervision, that he could perform it full time, and that he had been filling out job applications online to obtain other employment.  Tr. 25, 44, 47, 49-50, 58.  He took the bus to work and stated that he can read a bus schedule.  Tr. 25, 43, 53.  Although his father stated that Jude had, in the past, misread the bus schedule and missed the bus, Tr. 65, the ALJ observed that these were isolated incidents.  Tr. 25.  Moreover, Jude's father also stated that Jude used to make a transfer using public transportation, when he was participating in vocational training at the Cleveland Clinic, and that Jude could handle that himself after practicing with his father 3-4 times.  Tr. 65-66.

As for Jude's reliance upon his difficulty processing work pressure as assessed by Dr. Koricke (Doc. 12, p. 16, Tr. 702), the ALJ discredited this portion of Dr. Koricke's opinion because even Dr. Koricke had observed that Jude could understand and carry out simple instructions; had trouble with complex or multi-step instructions but could understand them if they were broken down into segments; and that Jude was not anxious, manic, or depressed, and he had a normal affect and mood.  Tr. 28, 712.  Moreover, the ALJ accounted for any limitation regarding work pressure by assessing an RFC that included simple, routine, and repetitive tasks not at a production rate pace; occasional, routine workplace changes that can be explained; and simple, work-related decision making.  Tr. 25.  Jude does not explain why the ALJ's RFC assessment does not sufficiently account for his limitation regarding workplace pressures.  Again, Jude has been working part time cleaning at the library and testified that he could perform this work full time.  His father was hard-pressed to disagree:

ALJ: Mr. Jude, do you think that Michael can maintain full-time employment?

A: Eventually.

Q: Okay. When is eventually?

A: He needs a lot of, he, right now, like I said, he has a lot more training, how can I put this? I don't think he is capable of, he's, this job he has now is repetitious, you know. You do this every day. You do this and then they'll rotate them to do a different job. But to get a full-time position he is going to need ...he's got a little more growing up to do[.]

Q: What if it's a simple, repetitious job? Well, let's take the job he is doing right now. Think he could do this job on a full-time basis, for example?

A: Possibly.

Tr. 70-71.  And, although Dr. Koricke concluded that Jude could not manage his own funds (Tr. 703), Jude had told Dr. Koricke during his evaluation that he had difficulty managing his funds and that his father did it for him (Tr. 700).  But the ALJ pointed out that the record showed that Jude could make change and save money (Tr. 26) and at the hearing he testified that he has a bank account and writes checks (Tr. 28).  He stops at the ATM machine while taking walks and withdraws cash.  Tr. 64.  In sum, the ALJ's explanation of why he did not give controlling weight to Dr. Needlman's opinion is supported by substantial evidence and does not run afoul of the treating physician rule.

Jude argues that Dr. Needlman has treated him since at least 2008, and that the length of the treating relationship and the frequency of examination is the first factor an ALJ considers when determining what weight to give a treating physician.  Doc. 12, p. 14.[4]  Jude does not explain how this fact amounts to error on the part of the ALJ.[5]  To the extent Jude complains that the ALJ gave greater weight to the state agency reviewing opinions over Dr. Needlman's opinion, Doc. 12, pp. 13-14, this fact, alone, is not reversible error.  *See* SSR 96–6p, 1996 WL

---

[4]  Following the assertion that Dr. Needlman has treated Jude since 2008, the brief erroneously includes language and citations to record evidence that do not appear to belong to Jude (Doc. 12, p. 14) because the brief states a different name and not all the treatment notes are from Dr. Needlman.

[5]  The undersigned notes that Dr. Needlman stopped treating Jude after he turned 18 because Dr. Needlman is a pediatric doctor.  Tr. 56, 68.

374180, at *3. Jude complains that the ALJ's RFC assessment "is not supported by a single doctor who ever examined Mr. Jude." Doc. 12, p. 14. Jude does not explain this assertion and the undersigned will not speculate as to what Jude's specific arguments may be. To the extent Jude suggests that an ALJ's RFC assessment has to be an adoption of a medical source's RFC assessment, this assertion fails. *See Shepard v. Comm'r of Soc. Sec.*, 705 Fed. App'x 435, 442-443 (6th Cir. 2017) (rejecting a claimant's assertion that the ALJ's RFC assessment must reflect any physician's opinion, observing that the ALJ is responsible for assessing an RFC based on her evaluation of the evidence; "[T]o require the ALJ to base her RFC on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability," quoting *Rudd v. Comm'r of Soc. Sec.*, 531 Fed. App'x 719, 728 (6th Cir. 2013)).

### B. Jude's other arguments lack merit

Jude's brief includes a number of additional, perfunctory complaints. He asserts that the ALJ improperly referred to "checkbox forms" that providers completed. Doc. 12, p. 14; Tr. 27 (the ALJ commenting that Drs. Olden and Urcuyo completed the same checkbox forms). Jude doesn't present an argument; the undersigned observes that an ALJ may properly consider the reliability of checkbox forms. *See Ellars v. Comm'r of Soc. Sec.*, 647 Fed. App'x 563, 566-567 (6th Cir. 2016) (ALJ did not err in discounting examiner's opinion that contained checkbox forms); 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). Moreover, the ALJ accurately explained that the opinions of Drs. Olden and Urcuyo were given little weight in part because it appeared they were based on Jude's father's reports, not objective exam findings of Jude. Tr. 27-28.

Jude finds fault with the ALJ's treatment of Dr. Koricke's opinion because the ALJ relied on some of Dr. Koricke's conclusions but not others.  Doc. 12, p. 16.  An ALJ is not required to adopt an opinion in toto.  *See Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009) (The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician, and the ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding.").  Finally, he argues that the ALJ did not address the evaluation performed by counselor Perrett and signed by Dr. Klooz, completed just prior to the alleged onset date.  Doc. 12, p. 16.  Although the ALJ did not discuss this evaluation, the evaluation was based on available records, also considered by the ALJ, and Jude and his father's reports, when Perret assessed Jude for participation in a program to help him find work after high school.  Tr. 690.  Similar to other opinion evidence in the record, the evaluation relied on reports from Jude and his father that do not reflect Jude's functional abilities.  For instance, the evaluation reads that Jude "requires complete assistance with utilizing banking facilities," paying bills, and maintaining a budget, yet the ALJ accurately found that Jude saved money for things he wanted and maintained his bank account.  Significantly, the evaluation was done prior to Jude graduating from the vocational program and obtaining, and maintaining, a part-time job while also looking for additional work.  Thus, Perrett's evaluation was cumulative, and any error for failing to discuss this evaluation was harmless.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: June 18, 2018

*/s/ Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).